IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| LAWRENCE J. GROWNEY, JR., | : | CIVIL ACTION NO. |
| | : | 1:15-CV-1147-ELR-JSA |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | **FINAL REPORT AND** |
| NCR CORPORATION, | : | **RECOMMENDATION ON A** |
| | : | **MOTION FOR SUMMARY** |
| Defendant. | : | **JUDGMENT** |

Plaintiff Lawrence J. Growney, Jr. sues his former employer, *pro se*, alleging that he was discriminated and retaliated against based on his status as a diabetic, in violation of the Americans With Disabilities Act of 1990, as amended ("ADA"), 42 U.S.C. § 12101 *et seq.* Both Plaintiff and Defendant have filed motions for summary judgment. As explained below, the Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment [39] be **DENIED** and Defendant's Motion for Summary Judgment [41] be **GRANTED**, and that judgment be entered in favor of Defendant on all of Plaintiff's claims.

## I.    FACTS

Local Rule 56.1B explains the obligations that each side bears in asserting and opposing motions for summary judgment. Local Rule 56.1B(1) first explains what a party must do to present a proper motion for summary judgment:

> A movant for summary judgment shall include with the motion and brief a separate, concise, numbered statement of the material facts to which the movant contends there is no genuine issue to be tried. Each material fact must be numbered separately and supported by a citation to evidence proving such fact. The court will not consider any fact: (a) not supported by a citation to evidence (including page or paragraph number); (b) supported by a citation to a pleading rather than to evidence; (c) stated as an issue or legal conclusion; or (d) set out only in the brief and not in the movant's statement of undisputed facts.

LR 56.1B(1), NDGa.

Local Rule 56.1B(2)(a)(2) then makes clear what a non-movant must do to respond to and oppose a properly presented motion for summary judgment:

> This Court will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1 B.(1).

LR 56.1B(2)(a)(2), NDGa.

The Eleventh Circuit has noted that compliance with Local Rule 56.1 is not a "mere technicality," because "[t]he rule is designed to help the court identify and organize the issues in the case." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) (citing *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008)). "Local Rule 56.1 protects judicial resources by mak[ing] the parties organize the evidence rather than leaving the burden upon the district judge." *Reese*, 527 F.3d at 1268

2

(quotation omitted); *see also Libel v. Adventure Lands of Am., Inc.*, 482 F.3d 1028, 1032 (8th Cir. 2007) ("Courts have neither the duty nor the time to investigate the record in search of an unidentified genuine issue of material fact to support a claim or a defense."). *Pro se* litigants are not excused from the procedural requirements that govern all parties at summary judgment. *See Johnson v. Warden*, 491 F. App'x 60, 62 (11th Cir. 2012).

Thus, it is each party's obligation to cite to evidence in the record that establishes a triable issue of fact, and the Court cannot cull through the entire record in an effort to search for evidence that creates a disputed issue. *See United States v. Adkinson*, 135 F.3d 1363, 1378-80 (11th Cir. 1998); *Johnson v. City of Ft. Lauderdale*, 126 F.3d 1372, 1373 (11th Cir. 1997); *see also Dickson v. Amoco Performance Prods., Inc.*, 845 F. Supp. 1565, 1570 (N.D. Ga. 1994) ("It should be a party's responsibility to direct the Court's attention separately to each portion of the record which supports each of the party's distinct arguments.").

Here, Defendant has filed a Statement of Material Facts ("SMF") [41-1] to support its Motion for Summary Judgment. Although Plaintiff filed a Motion for Summary Judgment [39], he has not filed any supporting statement of facts or any document that lists individually enumerated facts with citations to any competent evidence in the record, as required by Rule 56.1. While Plaintiff has filed a brief

opposing Defendant's Motion for Summary Judgment [46], he has likewise not specifically responded to Defendant's statement of facts as required by Rule 56.1B(2)(a)(2).

Thus, the Court generally draws the facts in this case from Defendant's SMF. Nevertheless, although not properly presented to the Court, the Court will endeavor to consider and discuss pertinent arguments and factual assertions made by Plaintiff in his briefs. The facts as asserted by Defendant, and not properly disputed by Plaintiff, are as follows:

Defendant hired Plaintiff to be a data modeler on June 28, 2010. SMF ¶ 1. A data modeler works as part of a software engineering team–that includes a project manager, business analyst and data architect–to build models that meet the needs of Defendant's clients. *Id.* ¶ 5. This is a highly technical position that requires excellent design skills, advanced training and critical thinking, and mistakes can be costly. *Id.* ¶¶ 6, 7. Beginning in April 2012, Plaintiff reported to Chief Data Architect James Baker. *Id.* ¶ 10. Baker reported to Brian Valeyko (Director for Enterprise Data and Business Intelligence), who in turn reported to William VanCuren (Chief Information Officer). *Id.* ¶ 11.

Plaintiff suffers from diabetes, although this condition did not hinder his ability to perform his job duties. *Id.* ¶¶ 13, 14. Plaintiff informed "several people" at NCR

that he was a diabetic beginning in 2011, and specifically told Baker this fact in or about May of 2012. *Id.* ¶ 15. Specifically, Plaintiff notified his supervisors that he was a Type 1 diabetic, that he takes insulin four times per day, that one of those times is during lunch, and that he had to measure his blood, take a shot, and eat lunch immediately afterwards. *Id.* ¶ 16. Plaintiff perceived this notification to be a request for accommodation. *Id.* ¶ 17. Plaintiff does not suggest that Defendant's management failed to accommodate him, but rather argues that certain co-workers interfered with this accommodation by surreptitiously monitoring his bathroom usage, as explained in more detail below. ¶ 17. However, Defendant points out that no formal accommodation was necessary, because Plaintiff worked in a salaried position, was not required to clock in or out (including for breaks), and successfully managed his need for breaks for several months prior to notifying management. *Id.* ¶ 18. He only notified management because of an incident in which be believed certain co-workers complained about his breaks, and he did not want upper management believing that he was slacking off. *Id.* ¶¶ 18-24.

At the end of February 2013, Baker issued Plaintiff an "unsatisfactory" performance rating for 2012, which was the lowest possible rating. *Id.* ¶ 26. Baker was not instructed to issue such a rating by any other manager or executive. *Id.* ¶ 27. On March 29, 2013, Baker also placed Plaintiff on a performance improvement plan

("PIP"). *Id.* ¶¶ 28, 29. Baker placed Plaintiff on a second PIP on September 24, 2013. *Id.* ¶ 30. Again, Baker was not instructed by any other manager or executive to do so. *Id.* Baker met with Plaintiff and provided him follow up reports on several occasions in October and November 2011, and was not instructed by any manager or executive to do so. *Id.* ¶¶ 31, 32. On November 11, 2013, Baker issued Plaintiff a Final Written Warning, and thereafter terminated Plaintiff on January 17, 2014. *Id.* ¶¶ 33-37. As with the other personnel actions, Baker was not instructed by any other manager or executive to take these actions. *Id.*

In 2013, NCR offered employees an incentive for voluntarily completing a biometric screening. *Id.* ¶ 40. To participate, employees submitted a screening form to Optum, a third-party with which NCR contracted to administer the biometric screening program. *Id.* On November 9, 2013, Plaintiff's physician sent a Health Provider Screening Form to Optum. *Id.* ¶ 41. Optum is a separate company from NCR, and does not share the biometric screening information that it receives from participants with NCR. *Id.* ¶¶ 42, 43.

On December 6, 2013, Plaintiff received a letter from UnitedHealthcare–a third-party that administers healthcare for NCR employees-notifying Plaintiff that he was due for a retinal eye exam related to his diabetes. *Id.* ¶¶ 44, 45. This letter was dated November 18, 2013. *Id.* ¶ 44. UnitedHealthcare does not send NCR copies of such

forms and NCR did not, in fact, receive a copy of this November 18, 2013 letter. *Id.* ¶ 46.

Plaintiff believes that he was harassed beginning in 2013 by NCR employees Joseph Koscik, Derek Minnich, and Adnan Mukhtar and others who reported to them. *Id.* ¶¶ 47-48. These individuals did not supervise Plaintiff and were not in his chain of command. *Id.* ¶ 12. Specifically, approximately 70-80 times during the course of 2013, Plaintiff observed either Koscik, Minnich or Muhktar standing about 20 feet from Plaintiff's desk while using a mobile phone after Plaintiff returned from a restroom break. *Id.* ¶ 49. Plaintiff concluded from these incidents that he was being monitored by video camera–possibly on his computer–but he was unaware of any evidence of such monitoring. *See id.* ¶¶ 50-53. On two occasions in April 2013, Plaintiff also observed Mukhtar in the restroom at the same time that Plaintiff was in there. *Id.* ¶ 50.

In addition, Plaintiff's building access card and workstation identification number were temporarily deactivated on November 25-26, 2013. *Id.* ¶ 57.Once notified of the problem, Baker and Valeyko made sure that Plaintiff's access was reactivated immediately. *Id.* ¶ 60. Plaintiff's healthcare benefits were also inadvertently canceled in November 2013, which caused him to receive a notice as to his ability to continue coverage under the Consolidated Omnibus Budget

Reconciliation Act ("COBRA"). *Id.* ¶ 62. Plaintiff's salary was not interrupted and he was not told that he was fired in November 2013. *Id.* ¶ 61. Once the error with regard to cancellation of his benefits was corrected in December 2013, all benefits were retroactively restored. *Id.* ¶¶ 62-64.

Plaintiff participated in Defendant's "Code of Conduct" training on four occasions between July 2010 and February 2013. *Id.* ¶ 3. Plaintiff thereby knew that Defendant prohibited discrimination on the basis of disability and that if he suffered such harassment he should report it to a manager. *Id.*

## II.   DISCUSSION

### A.   SUMMARY JUDGMENT STANDARD

Summary judgment is authorized when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 153 (1970); *Bingham, Ltd. v. United States*, 724 F.2d 921, 924 (11th Cir. 1984). The movant carries this burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In making its determination, the court

must view the evidence and all factual inferences in the light most favorable to the nonmoving party. *Matsushita v. Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Once the moving party has adequately supported its motion, the nonmoving party must come forward with specific facts that demonstrate the existence of a genuine issue for trial. *See id.* The nonmoving party is required "to go beyond the pleadings" and to present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmoving party's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

When considering motions for summary judgment, the court does not make decisions as to the merits of disputed factual issues. *See id.* at 248-49. Rather, the court only determines whether there are genuine issues of material fact to be tried. *See id.* Applicable substantive law identifies those facts that are material and those that are irrelevant. *See id.* at 248. Disputed facts that do not resolve or affect the outcome of a suit will not properly preclude the entry of summary judgment. *See id.*; *Lofton v. Sec'y of Dep't of Children & Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004)

("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment.").

If a fact is found to be material, the court must also consider the genuineness of the alleged factual dispute. *See Anderson*, 477 U.S. at 248. An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Id.* at 249-50. A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Moreover, for factual issues to be genuine, they must have a real basis in the record. *See Matsushita*, 475 U.S. at 587. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). Thus, the standard for summary judgment mirrors that for a directed verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

B.     DISABILITY DISCRIMINATION- TERMINATION

Plaintiff alleges that Defendant fired him because of an actual or perceived disability, that is, his condition of diabetes. The ADA was "designed to prohibit discrimination against disabled persons and enable those persons 'to compete in the workplace and the job market based on the same performance standards and requirements expected of persons who are not disabled.'" *Paleologos v. Rehab Consultants, Inc.*, 990 F. Supp. 1460, 1464 (N.D. Ga. 1998) (quoting *Harding v. Winn-Dixie Stores, Inc.*, 907 F. Supp. 386, 389 (M.D. Fla. 1995)). The statute forbids employers from discriminating against a "qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a); *see also Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001). Refusing to offer a reasonable accommodation to allow a disabled worker to perform the essential tasks of the job is a form of illegal discrimination under the ADA. *See* 42 U.S.C. § 12112(b)(5).

To prevail on a claim of disability discrimination, Plaintiff must show (1) that he has a disability within the meaning of the statute and relevant regulations; (2) that he is an otherwise qualified individual, that is, that he could perform the essential

tasks of his job with a reasonable accommodation; and (3) that Defendant discriminated against him based on his disability. *Wood v. Green*, 323 F.3d 1309, 1312 (11th Cir. 2003). If Plaintiff were to show a *prima facie* case of discrimination with regard to his termination in January 2014, the burden would shift to Defendant to show a legitimate, non-discriminatory reason for the termination. *See Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004). The burden would then shift back to Plaintiff to "demonstrate that the defendant's articulated reason for the adverse employment action is a mere pretext for discrimination." *See Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997).

1.    *Prima Facie Case*

For purposes of its summary judgment motion, Defendant does not appear to contest that Plaintiff can adduce at least a triable issue of fact as to the first two elements of a claim of disability discrimination, i.e., that Defendant suffered from a disability or perceived disability[1] and that Defendant was otherwise a "qualified

---

[1] The Eleventh Circuit has previously found that a mere diagnosis of diabetes is not sufficient to establish the existence of a disability, without case-specific evidence showing that the condition substantially limits one or more major life activities of the plaintiff. *See Collado v. United Parcel Service Co.*, 419 F.3d 1143, 1154-1155 (11th Cir. 2005). However, this case pre-dated the passage of the ADA Amendments Act ("ADAAA"), Pub L. No. 110-325, the purpose of which was to broaden the definition of disability. 29 C.F.R. § 1630.2(j)(1)(i) ("The term 'substantially limits' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. 'Substantially limits' is not

individual" for purposes of the ADA. Defendant, rather, focuses on the third element. Defendant argues that Plaintiff cannot adduce even *prima facie* evidence that Defendant terminated him because of his diabetes. The Court agrees.

Plaintiff alleges and apparently believes that there was a concerted plan in place at NCR to terminate him and other diabetic employees, to save health care costs. At this point in the case, however, Plaintiff must point to competent evidence sufficient to support a jury finding in his favor. Plaintiff appears to primarily rely on the close timing between his submission of a biometric screening form to Optum (in November 2013), his receipt of a reminder update of the need for a retinal exam from UnitedHealthcare (in early December 2013), and his termination in January 2014. Plaintiff also appears to allege that the decision to terminate him was made earlier than January 2014, because his access card was temporarily deactivated and he received a notification as to being terminated from health care benefits in November 2013.

At face value, the Court understands the conclusions that Plaintiff has reached from the timing of these events. But Plaintiff fails to show that Defendant was ever aware of the biometric form, or the health care notification, both of which involved

_____

meant to be a demanding standard."). The Court does not consider whether Plaintiff's condition would qualify as a disability or perceived disability under the more expansive definition of the ADAAA, because the issue has not been raised by Defendant, and in any event is moot in light of the many deficiencies with the claim otherwise as discussed below.

communications between Plaintiff and third parties. In fact, Defendant has produced affirmative evidence–that Plaintiff does not refute–denying that it received these communications or otherwise typically receives these sorts of communications. Thus, as Plaintiff does not show that Defendant even knew of these letters relating to his diabetic condition, it follows that the coincidence in timing vis-a-vis his termination is just that, i.e., a coincidence. No factfinder could reasonably infer Defendant's discriminatory intent from letters of which it was unaware.

Moreover, Defendant has shown that Plaintiff's supervisor, Baker, was the sole decision-maker with regard to placing Plaintiff on a PIP and eventually terminating him, and Baker was aware of Plaintiff's diabetes dating back to 2012. The undisputed evidence submitted by Defendant shows that Baker did not place Plaintiff on a PIP until approximately 10 months after first learning of Defendant's condition, and did not terminate him until approximately 21 months after that point. Such a long duration is insufficient in itself to suggest a connection between Defendant's knowledge of Plaintiff's condition and any adverse action. *See Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (three-month period in between protected activity and adverse action was not sufficiently close to support an inference of a causal link); *Higdon v. Jackson*, 393 F.3d 1211, 1221 (11th Cir. 2004) (three-month period does not allow a reasonable inference of causation); *see also Conner v. Schnuck Markets,*

*Inc.*, 121 F.3d 1390, 1395 (10th Cir. 1997) (lapse of four months between protected activity and termination did not support inference of causal connection).

As to the temporary cancellation of benefits and Plaintiff's employee access card in November 2013, Defendant has submitted evidence that this was inadvertent and was reversed once Baker and other appropriate officials were notified.

None of this evidence is disputed in any proper manner by Plaintiff. Nor does Plaintiff offer any evidence that Defendant treated similarly-situated non-diabetic employees more favorably than it treated him. Certainly, Plaintiff offers no direct evidence of discrimination, including express statements by Baker or some other alleged decision-maker evidencing discriminatory intent. Thus, a factfinder would be left only with Plaintiff's mere conjecture that a secret conspiracy targeting diabetics at the highest levels of NCR led to his dismissal, despite Defendant's affirmative evidence only showing otherwise. This speculation is insufficient to establish even a *prima facie* case of discriminatory intent.

2.     *Pretext*

Even if Plaintiff had pointed to *prima facie* evidence of discrimination, Defendant has sustained its burden to articulate and produce evidence of a legitimate, non-discriminatory reason for its action, that is, long-standing problems with Plaintiff's performance. Specifically, Defendant introduces sworn testimony from

15

Plaintiff's supervisor, Baker, who attests that he made the decision to terminate Plaintiff, because of Plaintiff's poor performance, which had not improved over the approximately nine-month period in which Plaintiff had been placed on a PIP. Baker Decl. [41-3] ¶¶ 1-9. Plaintiff, who fails to properly introduce any evidence into the record, fails to meet his burden to rebut this explanation and show significantly probative evidence that it is simply a pretext for intentional discrimination.

Plaintiff's response consists of his own unsworn assertions, and he attaches various exhibits not accompanied by any sworn, authenticating testimony. Pl. Br. [46]. Specifically, Plaintiff asserts in his unsworn legal brief that, contrary to Baker's assessments of his performance, Plaintiff in fact "has excellent design skills" and has "successfully collaborated with business sponsors and peers to deliver value and produce intellectual property." *Id.* at 7. Plaintiff also states that he was recognized within NCR for his work on "twelve highly successful project implementations" throughout 2012 and 2013. *Id.* at 8. To support this claim, Plaintiff attaches and quotes from twelve emails from various project managers and others, congratulating the teams that worked on various projects, including Plaintiff. *See* Pl. Br. [46] at 8-17, 36-63. Plaintiff also states that he "successfully completed" the first PIP. *Id.* at 17.

None of this constitutes competent evidence, however, and the Court rejects it all at the outset for that reason alone. Even if the Court were to consider these

unsworn statements and unauthenticated attachments, they would not create a material issue of fact in this case. Plaintiff's own subjective opinion about the value of his performance is simply not evidence of pretext. Employees may, and frequently do, disagree with their supervisors' poor opinions of their work. But such a disagreement is not sufficient to show that the supervisor's assessment is insincere and just a pretext for discrimination. *See Holifield*, 115 F.3d at 1565 ("the inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance."); *see also Shorette v. Rite Aid of Me., Inc.*, 155 F.3d 8, 15 (1st Cir. 1998) (plaintiff's personal opinions not sufficiently probative on the issue of pretext); *Ost v. W. Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 441 (7th Cir. 1996) ("[A] plaintiff's own opinions about [his] work performance or qualifications do not sufficiently cast doubt on the legitimacy of [his] employer's proffered reasons for its employment actions."); *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996) ("'It is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff.'") (quoting *Smith v. Flax*, 618 F.2d 1062, 1067 (4th Cir. 1980)).

    Nor do anecdotal congratulatory emails relating to specific projects refute Baker's testimony as to Plaintiff's overall poor performance. First, these emails are not from Baker. Even if one or more other project managers believed that Plaintiff did

a good job on individual projects, that is not evidence that Baker harbored some discriminatory animus, because "[i]t is the perception of the decision maker which is relevant." *Smith*, 618 F.2d at 1067; *see also Johnson v. Williams*, 117 F. App'x 769, 772 (D.C. Cir. 2004) (a disagreement among supervisors as to the quality of an employee's performance does not, in itself, create significantly probative issue of pretext).

Second, these emails did not purport to assess Plaintiff's overall work performance. These congratulatory emails were addressed to entire teams of employees–many of which include a dozen or more team members. Most of the emails simply listed Plaintiff as one of the many team members who apparently worked on a particular project. *See, e.g.,* Pl. Br. [46] at 55-56. That Plaintiff was part of one or more large teams that, in the aggregate, successfully completed projects, is obviously not inconsistent with Baker's evaluation of Plaintiff's overall work. To be sure, some of the emails included a few sentences specific to the contributions of various team members, including Plaintiff. *See, e.g.,* Pl. Br. [46] at 36-37. But that someone other than Baker made a few isolated nice comments about Plaintiff's work on a few

specific projects does not prove that the PIPs, the warnings letters, performance evaluations and eventual termination were all pretextual.[2]

Thus, the undersigned **RECOMMENDS** that Plaintiff's claim for discriminatory discharge on the basis of a disability be **DISMISSED**.

### C.   DISABILITY DISCRIMINATION- HARASSMENT/HOSTILE WORK ENVIRONMENT

Plaintiff claims that he was harassed because of his disability in violation of the ADA. A claim for harassment based on disability, as under similar anti-discrimination statutes, requires: (1) a showing that plaintiff belongs to a protected class; (2) that he was subject to unwelcome conduct; (3) that the harassment was based on his disability; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable. *See Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 582–83 (11th Cir.2000), *overruled on other grounds*, (citing *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.1999)). For purposes of its motion for summary judgment, Defendant argues that Plaintiff cannot establish a triable issue of fact as to the last three prongs of this test. Again, the Court agrees.

---

[2] Plaintiff's statement that he successfully completed the first PIP is inapposite, because it is undisputed that he was placed on a second PIP in September 2013. *See* SMF ¶ 30.

What Plaintiff appears to characterize as harassment is that certain co-workers regularly typed on cell phones near his desk at around the times when he used the restroom, and in a few cases entered the restroom while he was in there. Plaintiff believes that these co-workers targeted him with this conduct because of his diabetes. Again, however, Plaintiff offers nothing more than speculation on these points, which is insufficient to justify a trial.

At the outset, Plaintiff's *perception* that he was the target of harassment is not proof sufficient to create a material issue of fact. Plaintiff does not point to evidence that these co-workers said anything to him, or did anything to suggest that they were doing anything because of him, other than that they were typing on phones within 20 feet or so of his desk while "looking at me." *See* Pl. Dep. [49] at 181. Plaintiff simply has no proof that this conduct was related *to him* at all.

Plaintiff also offers no proof that this conduct was targeted against him *because of a disability*. Even if these co-workers noticed and raised an eyebrow at Plaintiff's restroom trips, that in itself does not show animus against Plaintiff because of his alleged disability. Indeed, Plaintiff does not show that these co-workers were even aware of his diabetes condition or that they treated other similarly-situated non-diabetics differently. Perhaps if these co-workers were taking note of Plaintiff's frequent restroom trips, they were only doing so precisely because they were unaware

that Plaintiff had a legitimate medical explanation. None of this in itself suggests knowledge of and intent to discriminate against Plaintiff because of his alleged disability.

Nor was this conduct so severe and pervasive as to materially alter the terms of Plaintiff's employment. Only when a workplace is "permeated with 'discriminatory intimidation, ridicule, and insult' . . . that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment'" is the law violated. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65–67 (1986)) (internal citations omitted). The facts of this case do not reach this standard. Plaintiff focuses on fairly innocuous actions of a few co-workers not expressly directed at him at all. Plaintiff himself characterizes the conduct as "very very subtle," and likely not something that anyone else would have even observed. SMF ¶ 54. To be sure, a hostile work environment can arise from conduct that is less severe, but that is nevertheless sufficiently "pervasive" as to create an abusive working environment. In that regard, the Court has considered Plaintiff's claim that he observed the perceived cell phone co-worker surveillance 70-80 times during 2013. While not isolated, that frequency translates into an average of less than two episodes per week. And especially when considering the innocuous– or, at most, highly "subtle"–nature of the

conduct, this number of incidents cannot be said to materially alter Plaintiff's conditions of work.

Finally, Plaintiff has adduced no proof to justify holding Defendant responsible for this "very very subtle" conduct of three co-workers. An employer is not liable for every action that a co-worker may take against another. Rather, a plaintiff alleging hostile work environment generally must show that the employer knew or should have known about the harassment and failed to take reasonable remedial steps to stop it. *See Henson v. City of Dundee*, 682 F.2d 897, 905 (11th Cir. 1982). "The employee can demonstrate that the employer knew of the harassment by showing that she complained to higher management of the harassment . . . or by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge." *Id.* (internal citations omitted). When an employer has promulgated a sexual harassment policy specifying "the steps a victimized employee should take to alert the employer of harassment," the employer is "deemed to have notice of the harassment sufficient to obligate it or its agents to take prompt and appropriate remedial measures" when the employee who alleges harassment makes "reasonably sufficient use of the channels created by [the] policy." *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1364 (11th Cir. 1999).

Plaintiff points to no competent testimony or other evidence showing that he complained about the alleged harassment to his supervisors or to NCR management generally. It is also undisputed that Plaintiff was aware of NCR's anti-harassment policy, and that he should report any harassment per that policy to his manager. SMF ¶ 3. Plaintiff argues in his brief that the bathroom surveillance was orchestrated by high level executives of NCR, and that his supervisor Baker was part of the conspiracy to target and terminate him for his diabetes. Therefore, the Plaintiff presumably would argue that any reporting of the harassment would be futile. But, again, the unsworn assertions in Plaintiff's briefs, complaint, or other pleadings are not evidence. And Plaintiff otherwise fails to adduce and point to sworn testimony or other evidence to support his speculation that he was targeted at the highest levels of NCR because of his medical condition. Thus, without any evidence that Plaintiff notified appropriate officials of the alleged harassment, and because he admits that the conduct was so "subtle" as to generally be unnoticeable, he cannot show a basis to hold NCR liable.

Even if Plaintiff had otherwise adduced colorable evidence supporting a hostile work environment claim, the claim would be still be untimely. A plaintiff cannot sue under the ADA without first filing a claim for discrimination with the Equal Employment Opportunity Commission, and any such claim must be filed within 180 days of the alleged violation. *See E.E.O.C. v. Summer Classics, Inc.*, 471 F. App'x

868, 869-870 (11th Cir. 2012). Thus, for Plaintiff's hostile work environment claim to be timely, at least some of the alleged harassment must have occurred within the 180 day period prior to July 14, 2014, which is the date of his EEOC complaint in this case. Because Plaintiff was terminated on January 17, 2014, only approximately one week or less of his employment falls within the 180 day limitations period.

Plaintiff does not show any timely conduct. Plaintiff does not dispute that the restroom monitoring ended as of September 2013. SMF ¶ 56. Plaintiff has alleged that the temporary deactivation of his building security card, workstation login credentials and healthcare benefits were all part of the harassment as well. But those events occurred in November 2013 and were fixed by December 19, 2013. *Id.* ¶¶ 57-64. Plaintiff's brief states without any explanation that the harassment persisted "into 2014" and included his eventual termination on January 17, 2014. *See* Pl. Br. [46] at 19. However, an outright termination is of a fundamentally different nature than–and cannot generally be just lumped in with–an ongoing pattern of hostile work environment. And unsworn and entirely conclusory assertions as to other undescribed acts of "harassment" that persisted "into 2014" are insufficient to establish a claim. For this and the many other reasons outlined above, the undersigned **RECOMMENDS** that Plaintiff's claim of harassment be **DISMISSED**.

D.    DISABILITY DISCRIMINATION- FAILURE TO ACCOMMODATE

The ADA requires employers to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability. 42 U.S.C. § 12112(b)(5)(A). To prevail on a failure-to-accommodate claim, Plaintiff must demonstrate that: (1) he is disabled; (2) he was a "qualified individual" under the ADA; and (3) he was discriminated against because of his disability by being denied a reasonable accommodation to allow him to keep working. *See Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001); *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1526 (11th Cir. 1997); *Harris v. H & W Contracting Co.*, 102 F.3d 516, 519 (11th Cir. 1996); *Morisky v. Broward Cnty.*, 80 F.3d 445, 447 (11th Cir. 1996).

Plaintiff alleges that he requested an accommodation in the form of being allowed to take up to four restroom breaks per day for taking insulin shots, including one immediately before eating lunch. SMF ¶ 16. Defendant first argues that Plaintiff does not establish that any request for an "accommodation" was ever made. According to Defendant's undisputed statement of facts, Plaintiff only notified management of the reason for his bathroom breaks because he believed certain co-workers complained about his breaks, and he did not want upper management believing that he was slacking off. *Id.* ¶¶ 18-24. This was not a request for "accommodation," according to Defendant, because Plaintiff was a salaried employee who did not have to clock in-

and-out for breaks, did not need permission to use the bathroom, and in fact had successfully managed his blood sugar at work for several months before he felt the need to explain the reason for his breaks. SMF ¶ 18. Even if Plaintiff's disclosure of his condition could have been interpreted as a "request" for an "accommodation," according to Defendant, Plaintiff admits that his supervisor granted the request. SMF ¶ 17.

Plaintiff, in his unsworn statements in his responsive brief, stated that "My [manager], James Baker, approved the accommodation, but the CEO, his three Directors and several NCR co-workers did not comply with his accommodation." Pl. Br. [46] at 20. Although Plaintiff did not explain this statement, it appears that he was referring to his perception that Koscik, Minnich or Muhktar were monitoring and reporting his bathroom usage, at the direction of the CEO. These allegations do not establish a failure-to-accommodate claim.

First, Plaintiff does not establish that he was unable to take sufficient breaks or that any other "accommodations" were necessary to allow for his bathroom usage. Indeed, Plaintiff does not dispute Defendant's assertions of fact, including that Plaintiff informed management of his condition solely to explain his bathroom usage, not to specifically request any accommodations. Plaintiff also does not dispute that, as a salaried employee who did not have to clock-in or clock-out, he already had

26

sufficient ability to take breaks to administer insulin even without specific authorization to do so.

Second, for all of the reasons explained above as to the lack of a hostile work environment, Plaintiff does not show how the actions of Koscik, Minnich or Muhktar negated any accommodations. That one or more of these co-workers might have loitered in the general vicinity of Plaintiff's work area one or two times a week–while typing on a cell phone–did not reasonably deny Plaintiff the ability to use the bathroom. Nor, as explained above, does Plaintiff show how such conduct would be attributable to Defendant.

Third, just as with the hostile work environment claim, a failure-to-accommodate claim premised on the perceived bathroom surveillance is untimely. Again, Plaintiff does not dispute that all bathroom monitoring ceased as of September 2013, *see* SMF ¶ 56, and yet he did not file any EEOC charge until approximately 10 months later, in July 2014. This filing fell well outside the 180-day limitations period for bringing an EEOC claim and thereby preserving a federal lawsuit. Accordingly, the undersigned **RECOMMENDS** the failure-to-accommodate claim be **DISMISSED**.

27

E.   RETALIATION

The ADA provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). The Eleventh Circuit has held that, because this provision creates a prohibition on retaliation under the ADA that is similar to the prohibition on retaliation found in Title VII, courts should evaluate ADA retaliation claims under the same framework used for Title VII retaliation claims. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1287 (11th Cir. 1997); *see also McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1075–77 (11th Cir. 1996) (relying on Title VII jurisprudence to interpret meaning of ADA provisions in a retaliation case).

To establish a *prima facie* case of retaliation under the ADA, a plaintiff must show the same elements generally required for a claim of illegal retaliation under Title VII: (1) that he engaged in statutorily protected expression, (2) that he suffered an adverse employment action, and (3) that there is some causal connection between the expression and the adverse employment action. *Stewart*, 117 F.3d at 1287. "An employment action is considered 'adverse' only if it results in some tangible, negative effect on the plaintiff's employment." *Lucas*, 257 F.3d at 1261. "Once a *prima facie*

28

case is established, the burden then shifts to the defendant employer to come forward with legitimate non-discriminatory reasons for its actions that negate the inference of retaliation." *Stewart*, 117 F.3d at 1287. If the defendant meets that burden, the plaintiff must then present evidence demonstrating that the employer's proffered legitimate reasons are merely a "pretextual ruse designed to mask retaliation." *Id.*

Plaintiff appears to confuse the claim of retaliation with that of discrimination. He alleges that his termination was retaliatory, but he fails to allege, much less establish, that his discharge related to any statutorily protected activity. Rather, Plaintiff explains his claim as follows: "NCR's reason for terminating my employment on November 22, 2013 was punitive–*it was because of my diabetes*. The retaliation by the CIO and his three directors was a pretext for termination of my employment." Pl. Br. [46] at 19-20 (emphasis added). Thus, Plaintiff alleges that he was retaliated against not for any protected expression, but rather because of his alleged disability. This is simply another way, however, of alleging that he was *discriminated* against in violation of the ADA. This theory does not also support a claim of *retaliation*, which is premised on one's protected acts of expression and not the underlying disability (if any). Thus, because Plaintiff fails to support his claim of retaliation with any facts at all, including as to any protected activity, the undersigned **RECOMMENDS** that his claim be **DISMISSED**.

29

## III.   RECOMMENDATION

As explained above, the Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment [39] be **DENIED** and Defendant's Motion for Summary Judgment [41] be **GRANTED**, and that this lawsuit be **DISMISSED WITH PREJUDICE**.

As this is a Final Report and Recommendation, there is nothing further in this action pending before the undersigned. Accordingly, the Clerk is **DIRECTED** to terminate the reference of this matter to the undersigned.

**IT IS SO RECOMMENDED** this 16th day of September, 2016.

_____

JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE